DAVID M. ROSENBERG-WOHL (Cal. Bar No. 132924)
HERSHENSON ROSENBERG-WOHL,
A PROFESSIONAL CORPORATION
315 Montgomery St., 8ᵗʰ Fl.
San Francisco, CA 94104
(415) 829-4330
david@hrw-law.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACKIE TABAS, LINDA HOBBS, TIM SAMARTINO, BARBARA SJODAHL, PATRICIA DAWN WALKER AND CHERYL WHELAN, ON BEHALF OF THEMSLEVES AND ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiff, <br><br> vs. <br><br> MOVIEPASS, INC., HELIOS AND MATHESON ANALYTICS INC., AND DOES 1-10, <br><br> Defendants. | Case No. 3:18-cv-7087 <br><br> **FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION]** |

1.     Plaintiffs, Jackie Tabas ("TABAS"), Linda Hobbs ("HOBBS"), Tim Samartino

("SAMARTINO"), Barbara Sjodahl ("SJODAHL"), Patricia Dawn Walker

("WALKER") and Cheryl Whelan ("WHELAN"), on behalf of themselves and all others

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 1

similarly situated ("Plaintiffs"), by and through the undersigned counsel, bring this Complaint against Defendants MoviePass, Inc. ("MOVIEPASS"), Helios and Matheson Analytics Inc. ("HMNY"), and Does 1-10 (together, "Defendants") for damages, restitution, declaratory and injunctive relief, and in support thereof state as follows:

**JURISDITION AND VENUE**

2.  This court has federal jurisdiction pursuant to 28 U.S.C. § 1331 under RICO (12th Claim for Relief). This Court also has federal diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the citizenship of the parties is completely diverse and the amount in controversy exceeds $75,000. Plaintiffs are citizens of California, Ohio and Florida. Defendants are corporate citizens of New York incorporated in Delaware. Doe defendants include individuals, who, on information and belief, live in New York. This Court has supplemental jurisdiction over the balance of the claims asserted herein under 28 U.S.C. § 1367.

3.  Defendants are subject to personal jurisdiction throughout California pursuant to 28 U.S.C. §§ 1391(b)(2) and (3) because they enter into contracts with consumers such as Plaintiffs who reside there or cause their business entities to do so.

4.  Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) because Defendants seek to do and do business in this county/District, Defendants have transacted business with Plaintiffs in this county/District, and Defendants are subject to personal jurisdiction in this county/District. *See, e.g.,* Exhibit 1.

**FACTUAL ALLEGATIONS**

MOVIEPASS: the Dream, the Financial Reality, and HMNY's "Bet the Company" Mistake

5.      MOVIEPASS is a company, as its name implies, that sells consumers subscriptions to go out to see movies in movie theaters. For a subscription, a consumer pays MOVIEPASS a monthly fee, for which she gains access to the movies in showing in movie theaters, nationwide. Using an app that the consumer downloads to his or her phone, the consumer identifies the movies playing in the area, selects a movie of choice at a showtime of choice, goes to the theater and uses the MOVIEPASS card as a debit card, transferring payment for the movie selected from MOVIEPASS to the theater.

6.      Mitch Lowe is the CEO of MOVIEPASS, Stacy Spikes and Hamet Watt are Co-Founders and Co-Chairmen. Lowe is the person responsible for day to day decision-making involving MOVIEPASS and interacting with MOVIEPASS' corporate parent, HMNY. Theodore Farnsworth is Chairman and CEO of HMNY. Stuart Benson is CFO and Secretary of HMNY.

7.      From its start in 2011, MOVIEPASS has struggled to find its proper model, both in terms of what it offers and its price. As it grew in size, MOVIEPASS tried several pricing structures, from 2-3 films/month, to "unlimited" plans with pricing based on market size. In December 2016, the service had 20,000 subscribers. As of 2018, MOVIEPASS offered an annual subscription for $89.95 with unlimited movies (one per day). It has also offered a quarterly pass, and it has offered – and continues to offer – a monthly service, which has had a variable price over time.

8.      On August 15, 2017, a majority interest in MOVIEPASS was purchased by the data analytics firm Helios and Matheson Analytics Inc. ("HMNY"). MOVIEPASS had a growing customer database. HMNY had money. The prize sought by HMNY's investment was the moviegoing habit data of MOVIEPASS customers. HMNY wanted to

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 3

sell this data. HMNY subsequently doubled down on its bet, increasing its ownership of MOVIEPASS to 91.8% and initiating a merger of MOVIEPASS into HMNY.

9.  The cash infusion allowed MOVIEPASS growth to explode. Following HMNY's investment in August 2017, MOVIEPASS membership shot up from the 20,000 subscribers of December 2016 to 400,000 in September, 2017. The number was 600,000 in October, 2017, 1 million in December, 2017 2 million in February, 2018 and 3 million in June 2018.

10. To fund this growth, HMNY has mortgaged its future. While MOVIEPASS membership continues to increase, the company has struggled to find a model that allows it to be profitable. MOVIEPASS survives on HMNY cash, and HMNY has increasingly bet its company on the ultimate profitability of MOVIEPASS data. The net income of HMNY in 2017 was $151M. In April 2018 HMNY sold $150M in stock. A considerable portion of the proceeds went to fund MOVIEPASS. In May 2018, HMNY lost $40M. In July, HMNY filed to raise another $1.2B to keep MOVIEPASS alive. In August, HMNY reported a loss of $100M in the second quarter.

11. In August, 2018, investors brought a class action lawsuit in the Southern District of New York against HMNY, Farnsworth and Benson. October, 2018 the Attorney General's office in New York opened an investigation into how the company had been communicating about its financial situation with its investors. Late that month, HMNY announced its intention to spin off MOVIEPASS in an attempt to insulate HMNY from the MOVIEPASS investment. As of November 16, 2018, HMNY stock was selling on NASDAQ at just over a penny a share.

The Basis for the Lawsuit

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 4

12. Innovation is risky: investors risk losing everything in the calculated hope of a big payout. Investors know the risks. But consumers are not investors. They part with a small amount of money for a promised good or service. They trust in the good will of their contracting partners. Their contracts are to be honored, even when the company from which they bought a service struggles financially. If anyone is to lose money, it is the company owners and investors – shareholders big and small. These are the individuals and entities that stood to gain considerably if their bet paid off.

13. Here, HMNY continually took steps to protect itself at the expense of MOVIEPASS subscribers. From the time it acquired majority ownership of MOVIEPASS, HMNY instructed MOVIEPASS to make promises too vague to be enforceable contracts, and breached promises it was obliged to honor. It viewed the MOVIEPASS customer base as data, not people. Its focus was upon increasing the database, not keeping its financial commitments to MOVIEPASS customers. MOVIEPASS customers were not the only victims here: HMNY, Farnsworth, Benson and Lowe operated an association in fact to manage what is in effect a criminal enterprise in the eyes of the law operating within the otherwise legitimate businesses of MOVIEPASS and HMNY (alternatively, by taking over the previously legitimate business of MOVIEPASS itself). The activity of the enterprise that violate criminal law is its demand, continually, that MOVIEPASS breach its contracts with its subscribers and post website announcements and write email traffic to MOVIEPASS customers that constitute representations known or reasonably known to be untrue (and are therefore fraudulent representations). Farnsworth and Benson, due to their respective responsibilities as CEO and CFO of HMNY, necessarily generated and carried out this activity through Lowe, CEO of their subsidiary. For example:

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 5

14. HMNY directed MOVIEPASS to break, and MOVIEPASS broke, MP's monthly contracts with consumers at least as of mid-July, 2018, removing most desirable movies and rendering the contracts worthless, all the while representing that these actions were consistent with MP's contractual commitments and simply designed to enhance them.

15. As of 8/24/18, HMNY directed MOVIEPASS to cancel, and MOVIEPASS cancelled, the one-year subscription plan and took from consumers the financial value of the remaining months on these contracts, because (1) they truncated service for remainder of the year; and (2) while they may have offered certain consumers a refund for the remainder, (a) they gave only one week to accept, and (b) if a consumer were to opt out, the consumer was precluded from signing up even for the monthly service for 9 months. Also, HMNY directed MOVIEPASS not to provide, and MOVIEPASS did not provide, a refund – whether promptly, easily, or at all -- when asked. Also, HMNY directed MOVIEPASS not to provide, and MOVIEPASS did not provide, access for consumers -- even truncated access -- for the remainder of the year for which consumers had paid.

16. HMNY directed MOVIEPASS to offer, and MOVIEPASS offered, monthly subscriptions which were too vague to be enforceable contracts, while nonetheless taking consumers' money for these subscriptions.

17. HMNY directed MOVIEPASS to offer, and MOVIEPASS offered, monthly subscriptions which offered consumers the choice of movies they wanted to see, all the while knowing this was not likely to be true and continually pulling specific movies and theaters from the list of availability.

18. Simultaneously with its fraud and breach of contract, HMNY made it virtually impossible for consumers to resolve any concerns. HMNY itself was and is nonexistent on

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 6

MOVIEPASS websites. HMNY directs MOVIEPASS to offer customer service in name, but in fact responses to email inquiries would consist of boilerplate language. MOVIEPASS, at the direction of HMNY, continually changes its language and removes the prior versions of terms and conditions from the MOVIEPASS website, making it impossible for consumers to know the terms that actually applied when they signed up. MOVIEPASS likewise fails to make itself available by any means to resolve consumer complaints and either ignores them or waits some time before responding, at which point the response is generic saying nothing responsive to the particular complaint at hand and giving no hint as to what a consumer should do next to resolve the issue.

The Arbitration Clause

19.  Originally neither offering nor arbitration as a way of resolving disputes, MOVIEPASS, at the direction of HMNY, introduced the clause into at least one of its subscription contracts effective on or about October 30, 2017.

20.  From October 30, 2017 to the present, MOVIEPASS has created at least nine iterations of its terms and conditions, many of which have affected the language in the arbitration clause. None of these arbitration clauses are part of its actual contractual agreements with its customers:

   a.  MOVIEPASS has never called the introduction of this clause of any changes to its customers. It told none of its existing or prospective customers that it was about to or had in fact introduced an arbitration clause into its Terms and Conditions in October 2017, either explicitly by identifying the language or by providing a link to see operative changes, or indirectly by encouraging its membership to review carefully the Terms and Conditions that would apply to them.

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 7

b.  By contrast, MOVIEPASS has concealed not just its introduction of this clause but its changes to this clause, both by emphasizing *other* changes in its regular if not ubiquitous emails to its customers -- and by secreting the language at the end of a very long Terms and Conditions – and in text that is not differentiated from any of the surrounding text -- that a customer would have to search for and click to obtain, and then read the document through to the very end, in order to find.

c.  MOVIEPASS has obfuscated whether an arbitration clause might apply to a particular consumer's contract by regularly removing the versions of the Terms and Conditions that applied to a given customer upon signing up, refusing to provide these upon request or as reasonably required, and presenting whatever happens to be the current Terms and Conditions as containing the relevant language for a given dispute.

d.  MOVIEPASS has concealed that these arbitration clauses have in fact changed over time and presently misrepresents that the arbitration clause last modified in a contract version of 7/5/18 applies to *all* enrollments before 12/6/18.

e.  MOVIEPASS has also obfuscated the way in which arbitration would work in a given dispute by confusing and contradictory wording of the clause, including but not limited to how to arbitrate, where to arbitrate, and what rules are to apply.

f.  MOVIEPASS has also repeatedly fail to explain that arbitration is a pathway to resolve a given dispute, failed to answer questions about the arbitration process, and ignored requests for arbitration made to it.

g.  By its specific choices of what to conceal, as well as its specific choices of how to obscure the existence of the arbitration clause, as well as its specific choices of

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 8

how to obfuscate the way in which arbitration would work in a given dispute, as well as its specific choices of failing to explain arbitration as the pathway to resolve a given dispute, ignoring requests for arbitration, and a business plan that expects consumers not to use the arbitration process, MOVIEPASS has tried to make sure that any consumer who signs up for its service is unaware of any arbitration clause that conceivably might be applicable to that consumer and, on information and belief, MOVIEPASS has been successful, in that all or virtually all of its customers either are unaware of whether there is an applicable arbitration clause or if any consumer happens to be so aware, that consumer cannot reasonably determine which arbitration clause within which contract is supposed to apply, and what any of this actually means. MOVIEPASS counts on this, as does HMNY: it expects and knows that consumers are confused and intimidated by long and hard to read form contracts, that if they even read the arbitration agreement they will not know what to do with it and certainly will not use it, and in fact, consumers do not use it. Nor does MOVIEPASS use arbitration against any of its consumers. Alternatively, MOVIEPASS has used this process against its consumers far more frequently than any consumer has used the process against MOVIEPASS. Discovery will document all of this.

Plaintiffs

21.  Jackie Tabas ("TABAS") is a California consumer who has been, and is presently, a MOVIEPASS subscriber. She signed up for monthly membership on 11/20/17, paying $9.95/month. She pays a certain amount each month in exchange for the offer from MOVIEPASS to make available a certain number of movies that she wants to see.

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 9

TABAS has had increasing difficulty finding movies that she wishes to see available on the MOVIEPASS app.

22. Linda Hobbs ("HOBBS") is a California consumer who signed up for the MOVIEPASS one-year subscription plan at $89.95 in January, 2018. She attended 5-7 movies per week until the Summer, 2018, when a Tom Cruise action blockbuster was in the theaters. She tried to register complaints regularly, sometimes being able to reach a live person by telephone. At the time she was denied entrance to the Tom Cruise movie at her local AMC Rolling Hills Theatre, MOVIEPASS had eliminated its phone staff. At that point, HOBBS' communications with MOVIEPASS were through her account on her cell phone, as they had advised. Being concerned that MOVIEPASS would charge her card for a second year, online, she attempted to cancel her card via her account, as MOVIEPASS had instructed online. It was very difficult to determine when and how to cancel. She wanted to continue until January but decided to cancel in October, 2018, two months earlier, rather than have to fight to obtain a refund for a second yearlong contract that she did not authorize. She tried to obtain information about a refund for the remaining months but read on Reddit there was now no one to contact. Her contract ended January, 2019.

23. Tim Samartino ("SAMARTINO") is a California consumer who signed up for the MOVIEPASS one-year subscription plan in March, 2018. First, he noticed that MOVIEPASS took away the ability to see a movie multiple times. Then he noticed that MOVIEPASS limited the amount of movies he could see to 3 per month. Then he noticed that MOVIEPASS started limiting showtimes available within the app (he went to the theater several times when a movie showed available in the app only to find out he could

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 10

not check in once he arrived since it had been removed, and he could not contact customer support via the app in order to resolve this). Then he noticed that all showtimes disappeared from the app – he hasn't been able to use it at all for several months. He complained at least 2 times via the MOVIEPASS app chat, the response to which has been "we are sorry the movie you wanted to see is not appearing in the app, please try again a different day." He submitted a refund request on 12/19/18. MOVIEPASS responded "I sincerely apologize for any frustrations you have experienced while being a MoviePass member. I understand that the changes in showtime availability have impacted your desire or ability to use the service. However, I am not able to refund you for the time remaining on your annual subscription as the status of your unlimited account remains the same. You are still able to see one supported movie a day in accordance with our rotating schedule found here: MoviePass.com/movies. As your account is annual it will remain active through March 18th, 2019. At that time it will cancel out and you will not incur any additional fees." Even though his contract ends 03/18/19, the service is useless at present since there are no showtimes available (having checked at least 7 times since writing to cancel).

24. Barbara Sjodahl ("SJODAHL") is an Ohio consumer who signed up for the MOVIEPASS one-year subscription in April, 2018. Since August, 2018, she has only been able to see one movie with my MoviePass. That was an hour away from her home at an eticket theater. She decided to make the long drive just so she could use her membership and not feel completely cheated. MoviePass has now stopped offering eticketing. She tries several times a week to use MOVIEPASS, but there are no movies at any of the dozen theaters near her. If a movie happens to register as earlier in the day, it's

gone by 4:00 PM. In August, 2018 she learned that MOVIEPASS changed the terms from 1 movie a day to 3 movies a month. At that time she was given the option to cancel, but she thought 3 movies a month for roughly $7 was still a good deal, so she decided not to cancel. However, since MOVIEPASS has been offering no movies, she has asked repeatedly for them to refund her money, but when they finally reply, she only gets pat answers saying nothing.

25. Patricia Dawn Walker ("WALKER") is a Florida consumer who signed up for the MOVIEPASS monthly subscription in March, 2018 at $9.95/month for 1 movie/day. Beginning in June-July, 2018, WALKER could no longer find movies to see. Sometimes no movies were available that I hadn't either already seen or that I wasn't interested in watching. She sent numerous emails and make several phone calls complaining, and received no satisfaction. She cancelled at the end of August 2018.

26. Cheryl Whelan ("WHELAN") is a California consumer who purchased an annual subscription in March, 2018. In July, WHELAN began having problems not seeing movies she wanted to see – her pass simply wouldn't work. At times, she was told by MOVIEPASS to walk around the movie theater a number of times, trying time after time. That didn't work. MOVIEPASS reimbursed one movie, then stopped answering her queries. In August, WHELAN received an email telling her she could no longer see an unlimited number of movies but was limited to three per month. That message was confirmed in a telephone conversation. Regardless, she has not been able to see any movie for the past four months. Upon calling, she has received many different reasons for the lack of any available screenings. Sometimes MOVIEPASS said it would "reset" her

pass, but if that ever happened, it made no difference. MOVIEPASS represented that her lack of access was just random, so WHELAN kept hoping it would work.

27. There were times when WHELAN would go to the movies with a friend who had a monthly pass. Movies that had space, and that her friend could access, were not available to WHELAN.

28. WHELAN also purchased a gift pass for her sister. Due to her sister's poor health, she was unable to attend movies with WHELAN. WHELAN cancelled this account. Her sister returned to health shortly thereafter, but she no longer had her account card. MOVIEPASS said it would cost $10 for a new card. WHELAN paid the $10. But her sister has not been able to use the gift pass. WHELAN had accepted MOVIEPASS's representations that WHELAN's problems were idiosyncratic; she had no idea her sister was going to have all the same problems as WHELAN herself had experienced and would not have either purchased the gift originally or the replacement card if she had known her sister would have the same problems.

**CLASS ACTION ALLEGATIONS**

29. **Class definition**.

   a.  Consumers who have purchased monthly subscriptions but have not been able to find the promised number of movies they want to see.

   b.  Consumers who have purchased monthly subscriptions but have not been able to find a reasonable number of movies they want to see for the price paid.

   c.  Consumers who have purchased quarterly subscriptions but have not been able to find the promised number of movies they want to see.

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 13

d.  Consumers who have purchased quarterly subscriptions but have not been able to find a reasonable number of movies they want to see for the price paid.

e.  Consumers who have purchased annual subscriptions but have not been able to find movies they want to see.

f.  Consumers who have purchased annual subscriptions but have not been able to find a reasonable number of movies for the price paid.

g.  Consumers who have canceled subscriptions but have not been able to use their membership for the remainder of the term.

h.  Consumers who have canceled subscriptions but have not been able to obtain a refund.

i.  Consumers who have found that their cards do not work even though a movie is available at a specific theater.

j.  Consumers who have found that their cards do not work even though a movie was identified as available at a specific theater.

k.  The foregoing classes are national in scope. Subclasses exist for California consumers.

30.  Numerosity. There are so many potential class members that individual joinder of class members is impractical. Plaintiffs come from different states; the internet reflects a broad group of dissatisfied customers.

31.  Commonality. There are questions of law or fact common to class members. There are only three types of contracts MOVIEPASS offered – monthly, quarterly and annual – and they are all governed by the same Terms and Conditions applicable at the time a customer signs up. All customers share the experience of obtaining less for their money

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 14

than promised by MOVIEPASS. The subclasses identified above are a tentative grouping of similarly situated customers. These may change, of course, with discovery. All versions of the Terms and Conditions identify New York law as the choice of law. That law can be applied equally to customers of every state. Certain of the named plaintiffs are Californians. California has an interest in applying its own laws to protect its consumers; those named plaintiffs have claims in common with their fellow Californians.

32.    Typicality. Claims of Plaintiffs as class representative are typical of those of absent class members. The claims identified above run the gamut of the sort of problems that MOVIEPASS customers have experienced.

33.    Adequacy of representation. Class counsel and Plaintiffs intend to fairly and adequately protect the interests of absent class members. Class counsel is experienced in class action matters, and Plaintiffs understand their obligations are to the potential class they seek to represent.

34.    It is anticipated that other class members will be added before the seeking of class certification.

**FIRST CLAIM FOR RELIEF**

**(Breach of Contract) [MOVIEPASS]**

35.    Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-34 of this Complaint as if fully set forth herein.

36.    MOVIEPASS has breached Plaintiffs' contracts by failing to honor their terms and frustrating their purpose.

**SECOND CLAIM FOR RELIEF**

**(Breach of Contract) [MOVIEPASS]**

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 15

37. Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-36 of this Complaint as if fully set forth herein.

38. MOVIEPASS has breached Plaintiffs' contracts by violating the terms of good faith and fair dealing implied by fact and law in each of these contracts.

**THIRD CLAIM FOR RELIEF**

**(Breach of Contract) [MOVIEPASS]**

39. Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-38 of this Complaint as if fully set forth herein.

40. MOVIEPASS has breached Plaintiffs' contracts by retaining the financial benefits provided to MOVIEPASS by Plaintiffs while refusing either a refund or continued access to the service.

**FOURTH CLAIM FOR RELIEF [MOVIEPASS]**

**(Continuous Serv. Offer, Cal. Bus. & Prof. Code § 17602(a)(1)) (CA plaintiffs only)**

41. Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-40 of this Complaint as if fully set forth herein.

42. MOVIEPASS failed to disclose the terms of the continuous service offer, including the minimum purchase obligation, recurring charge, continuation until cancellation, length of term and cancellation policy. It did not.

43. MOVIEPASS should have disclosed the above identified terms in a clear and conspicuous manner, in a way that could be appreciated before the offer was fulfilled, and in visual proximity to its request for a consumer's consent. It did not.

44. As a result of MOVIEPASS' conduct, Plaintiffs have paid for a product they did not seek out, did not agree to, and have never been given adequate opportunity to cancel.

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 16

**FIFTH CLAIM FOR RELIEF [MOVIEPASS]**

**(Auto-Renewal Offer, Cal. Bus. & Prof. Code § 17602) (CA plaintiffs only)**

45.   Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-44 of this Complaint as if fully set forth herein.

46.   Before the time a consumer renews a MOVIEPASS subscription, MOVIEPASS should disclose the terms of the auto-renewal offer, including the minimum purchase obligation, recurring charge, continuation until cancellation, length of term and cancellation policy. It has not.

47.   MOVIEPASS should have disclosed the above-identified terms in a clear and conspicuous manner, in a way that could be appreciated before the offer was fulfilled, and in visual proximity to its request for a consumer's consent. It has not.

48.   MOVIEPASS is prohibited from charging the consumer's credit card for auto-renewal without obtaining that consumer's affirmative consent. It has not.

49.   MOVIEPASS is required to provide an acknowledgement of the auto-renewal terms, the cancellation policy, and the cancellation information in a form easily retainable. It has not.

50.   MOVIEPASS is required to provide an acknowledgement of the auto-renewal terms, the cancellation policy, and the cancellation information in a form easily retainable. It has not.

51.   The cancellation information to be provided should include a number/email/address or other easy mechanism described clearly. If the mechanism for obtaining MOVIEPASS is online, as it was in every case here, the mechanism for cancellation must be on-line. MOVIEPASS has not complied.

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 17

52.  As a result of MOVIEPASS' conduct, Plaintiffs have paid for a product they did not seek out, did not agree to, and have never been given adequate opportunity to cancel.

**SIXTH CLAIM FOR RELIEF [MOVIEPASS]**

**(*Quantum Meruit*)**

53.  Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-52 of this Complaint as if fully set forth herein.

54.  None of the subscriptions entered into were contracts because the content/inventory was exclusively controlled by MOVIEPASS. As a result, Plaintiffs paid far more than the benefit they received, and MOVIEPASS has retained Plaintiffs' money.

**SEVENTH CLAIM FOR RELIEF [MOVIEPASS]**

**(Unjust Enrichment)**

55.  Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-54 of this Complaint as if fully set forth herein.

56.  Under all of the subscriptions, Plaintiffs paid far more than the benefit they received, and MOVIEPASS has retained Plaintiffs' money.

**EIGHTH CLAIM FOR RELIEF [MOVIE PASS]**

**(CLRA) (CA plaintiffs only)**

57.  Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-56 of this Complaint as if fully set forth herein.

58.  This conduct is in violation, *inter alia*, of California Civil Code sections: CLRA §§ 1770(a)(6) – "[a]dvertising goods or services with intent not to sell them as advertised;" (7) – "[a]dvertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity;" (10) – "[m]aking

false or misleading statements concerning reasons for price reductions;" and (12) – "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not."

59. Notice was sent by Plaintiffs under CLRA § 1782(a)(2) offering Defendants the chance to correct, replace or otherwise rectify the goods/services described above. *See* Exhibit 2.

**NINTH CLAIM FOR RELIEF [MOVIE PASS]**

**(FAL) (CA plaintiffs only)**

60. Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-59 of this Complaint as if fully set forth herein.

61. This conduct constitutes the making false or misleading statements under the California FAL [Cal. Bus. and Prof. Code §§ 17500; 17535].

**TENTH CLAIM FOR RELIEF [HMNY]**

**(Inducement To Breach MOVIEPASS Contracts)**

62. Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-61 of this Complaint as if fully set forth herein.

63. This conduct constitutes inducement to MOVIEPASS to breach its contracts with its consumers.

**ELEVENTH CLAIM FOR RELIEF [HMNY, MOVIEPASS]**

**(UCL) (CA plaintiffs only)**

64. Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-63 of this Complaint as if fully set forth herein.

65. This conduct is unlawful, fraudulent and unfair under the California Unfair Competition law [Cal. Bus. and Prof. Code §§ 17200; 17204].

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 19

## TWELFTH CLAIM FOR RELIEF [MOVIEPASS]

## (New York GBL §§ 349 and 350)

66. Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-65 of this Complaint as if fully set forth herein.

67. This conduct is consumer-oriented, materially misleading, and caused injuries to Plaintiffs.

## THIRTEENTH CLAIM FOR RELIEF [HMNY]

## (RICO)

68. Plaintiffs incorporate by reference and hereby re-allege the allegations of paragraphs 1-67 of this Complaint as if fully set forth herein.

69. Persons who took actions that are culpable, identified above, are HMNY itself, Farnsworth, Benson and Lowe. The enterprise is an association in fact organized to determine how to operate MOVIEPASS, within the otherwise legitimate business entities, HMNY and MOVIEPASS.

70. Alternatively, persons who took actions that are culpable, identified above, are HMNY itself, Farnsworth and Benson. The enterprise is the MOVIEPASS operation itself, otherwise operating as a legitimate business entity.

71. As alleged above, Defendants have pursued this enterprise by committing two or more acts of wire fraud via email correspondence to MOVIEPASS consumers.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants that:

A. Defendants be preliminarily and permanently enjoined from committing the acts alleged herein as well as be declared in violation of each of these laws;

FIRST AMENDED COMPLAINT ON STIPULATION, AS ORDERED [CLASS ACTION] - 20

B.  Defendants be ordered to pay Plaintiffs' actual, consequential, incidental and special damages;

C.  Defendants be ordered to pay nominal damages;

D.  Defendants be ordered to provide restitution to Plaintiffs;

E.  Defendants be ordered to pay Plaintiffs' attorneys' fees and costs to the extent available under the statutes sued hereunder;

F.  Defendants be ordered to pay civil penalties;

G.  Defendants be ordered to pay statutory damages;

H.  Defendants be ordered to pay interest;

I.  Plaintiffs be awarded punitive and/or exemplary damages; and

J.  Plaintiffs be awarded such other and further relief as the Court deems just and proper.

**JURY DEMAND**

72.  Plaintiffs respectfully requests a jury trial on all issues triable thereby.


Dated this 15th of February, 2019.


/s/ David M. Rosenberg-Wohl
David M. Rosenberg-Wohl
HERSHENSON ROSENBERG-WOHL
A PROFESSIONAL CORPORATION



DECLARATION OF JACKIE TABAS

1. I am Jackie Tabas. I know the facts in this declaration from my own experience and knowledge and would testify to them if called as a witness.

2. I live in the City and County of San Francisco, State of California. I regularly receive and respond to email in this county. I signed up for, received, used and attempted to use MoviePass within California.

3. Due to the fact that MoviePass was marketed to me in California, and that I have used MoviePass within California, I state on information and belief that MoviePass Inc. has done and continues to do substantial business in California.

4. Because I understand that MoviePass is majority owned by Helios and Matheson Analytics, I state on information and belief that MoviePass Inc. has done and continues to do substantial business in California.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on November ___, 2018

Jackie Tabas

1

HERSHENSON
ROSENBERG-WOHL
A PROFESSIONAL CORPORATION
315 Montgomery St., 8th Fl.
San Francisco, CA 94104
(415) 829-4330

September 27, 2018

Helios and Matheson Analytics Inc.
350 Fifth Ave., Ste. 7520
New York, NY 10118

Theodore Farnsworth
Chairman and Chief Executive Officer
Helios and Matheson Analytics Inc.
350 Fifth Ave., Ste. 7520
New York, NY 10118

Stuart Benson
Chief Financial Officer
Helios and Matheson Analytics Inc.
350 Fifth Ave., Ste. 7520
New York, NY 10118

MoviePass Inc.
175 Varick St., 6th Fl.
New York, NY 10014

VIA CERTIFIED/REGISTERED MAIL, RETURN RECEIPT REQUESTED

Re:     Notice under California's CLRA, section 1782

To Whom It May Concern:

This office represents Jackie Tabas, a consumer who is presently a MoviePass subscriber, and Katherine Rosenberg-Wohl, a consumer who signed up for the MoviePass one-year subscription plan at $89.95 on 11/17/17 – a plan she held until she canceled it on 8/3/18. Others, who are similarly situated, may likewise join in our representation.

Helios and Matheson Analytics Inc. ("HMNY") bought a majority stake in MoviePass Inc. ("MP") on 8/15/17. HMNY directed MP to break, and MP broke, MP's monthly contracts with consumers at least as of mid-July, 2018, removing most desirable movies and rendering the contracts worthless, all the while representing that these actions were consistent with MP's contractual commitments and simply designed to enhance them. As of 8/24/18, HMNY directed MP to cancelled, and MP cancelled, the one-year subscription plan and cost consumers the remaining months on that contract, because (1) they truncated service for remainder of the year; and (2) while they may have offered certain consumers a refund for the remainder, (a) they gave only one week to accept, and (b) if a consumer were to opt out, the consumer was precluded from signing up even for the monthly service for 9 months. Also, HMNY directed MP and MP (3) did not provide a refund – whether promptly, easily, or at all -- when asked. Also, HMNY directed MP and MP (4) did not provide access for consumers -- even truncated access -- for the remainder of the year for which consumers had paid. Specifically, Ms. Tabas cannot find available the movies she

EXH. 2
1

September 27, 2018
Page 2

wishes to see, and Ms. Rosenberg-Wohl, while promised that her membership is still active, can no longer use her card and cannot, despite repeated attempts, get either service or a refund from MP. Messers. Farnsworth and Benson are named individually because, due to their respective responsibilities as CEO and CFO, any of the above decisions made by HMNY must have been made upon either their recommendation or their approval.

This conduct is in violation, *inter alia*, of California Civil Code sections: CLRA Section 1770(a)(6) – "[a]dvertising goods or services with intent not to sell them as advertised;" (7) – "[a]dvertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity;" (10) – "[m]aking false or misleading statements concerning reasons for price reductions;" and (12) – "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not."

My clients are entitled to actual damages, an injunction, restitution, punitive damages, attorneys' fees, as well as any relief a court deems proper under CLRA section 1780(a). Because the conduct described above has caused damage to other consumers similarly situated, my clients may bring an action for the relief described on behalf of not just themselves but other consumers under CLRA section 1781(a). Under CLRA section 1782(a)(2), my clients demand that Helios and Matheson Analytics, Inc., on its part, and MoviePass Inc., on its part, correct, replace or otherwise rectify the goods/services described above in a way that makes them whole, makes similarly situated consumers whole, and makes sure that no other consumers are subject to this conduct.

HMNY and MP are liable under other state statutes beyond California's CLRA, as well as federal law. But while other statutes do not provide a 30-day safe harbor of sorts should a proper response be made to this Notice, California's CLRA does, hence this letter.

Very truly yours,

HERSHENSON ROSENBERG-WOHL, a Professional Corporation

By: _____
David M. Rosenberg-Wohl

EXH. 2

2

HERSHENSON
ROSENBERG-WOHL
A PROFESSIONAL CORPORATION
315 Montgomery St., 8th Fl.
San Francisco, CA 94104
(415) 829-4330

September 27, 2018

Helios and Matheson Analytics Inc.
350 Fifth Ave., Ste. 7520
New York, NY 10118

Theodore Farnsworth
Chairman and Chief Executive Officer
Helios and Matheson Analytics Inc.
350 Fifth Ave., Ste. 7520
New York, NY 10118

Stuart Benson
Chief Financial Officer
Helios and Matheson Analytics Inc.
350 Fifth Ave., Ste. 7520
New York, NY 10118

MoviePass Inc.
175 Varick St., 6th Fl.
New York, NY 10014

VIA CERTIFIED/REGISTERED MAIL, RETURN RECEIPT REQUESTED

Re:     Notice under California's CLRA, section 1782

To Whom It May Concern:

This office represents Jackie Tabas, a consumer who is presently a MoviePass subscriber, and Katherine Rosenberg-Wohl, a consumer who signed up for the MoviePass one-year subscription plan at $89.95 on 11/17/17 – a plan she held until she canceled it on 8/3/18. Others, who are similarly situated, may likewise join in our representation.

Helios and Matheson Analytics Inc. ("HMNY") bought a majority stake in MoviePass Inc. ("MP") on 8/15/17. HMNY directed MP to break, and MP broke, MP's monthly contracts with consumers at least as of mid-July, 2018, removing most desirable movies and rendering the contracts worthless, all the while representing that these actions were consistent with MP's contractual commitments and simply designed to enhance them. As of 8/24/18, HMNY directed MP to cancelled, and MP cancelled, the one-year subscription plan and cost consumers the remaining months on that contract, because (1) they truncated service for remainder of the year; and (2) while they may have offered certain consumers a refund for the remainder, (a) they gave only one week to accept, and (b) if a consumer were to opt out, the consumer was precluded from signing up even for the monthly service for 9 months. Also, HMNY directed MP and MP (3) did not provide a refund – whether promptly, easily, or at all -- when asked. Also, HMNY directed MP and MP (4) did not provide access for consumers -- even truncated access -- for the remainder of the year for which consumers had paid. Specifically, Ms. Tabas cannot find available the movies she

September 27, 2018
Page 2

wishes to see, and Ms. Rosenberg-Wohl, while promised that her membership is still active, can no longer use her card and cannot, despite repeated attempts, get either service or a refund from MP. Messers. Farnsworth and Benson are named individually because, due to their respective responsibilities as CEO and CFO, any of the above decisions made by HMNY must have been made upon either their recommendation or their approval.

This conduct is in violation, *inter alia*, of California Civil Code sections: CLRA Section 1770(a)(6) – "[a]dvertising goods or services with intent not to sell them as advertised;" (7) – "[a]dvertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity;" (10) – "[m]aking false or misleading statements concerning reasons for price reductions;" and (12) – "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not."

My clients are entitled to actual damages, an injunction, restitution, punitive damages, attorneys' fees, as well as any relief a court deems proper under CLRA section 1780(a). Because the conduct described above has caused damage to other consumers similarly situated, my clients may bring an action for the relief described on behalf of not just themselves but other consumers under CLRA section 1781(a). Under CLRA section 1782(a)(2), my clients demand that Helios and Matheson Analytics, Inc., on its part, and MoviePass Inc., on its part, correct, replace or otherwise rectify the goods/services described above in a way that makes them whole, makes similarly situated consumers whole, and makes sure that no other consumers are subject to this conduct.

HMNY and MP are liable under other state statutes beyond California's CLRA, as well as federal law. But while other statutes do not provide a 30-day safe harbor of sorts should a proper response be made to this Notice, California's CLRA does, hence this letter.

Very truly yours,

HERSHENSON ROSENBERG-WOHL, a Professional Corporation

By: _____
David M. Rosenberg-Wohl

EXH. 2

2

HERSHENSON
ROSENBERG-WOHL
A PROFESSIONAL CORPORATION
315 Montgomery St., 8th Fl.
San Francisco, CA 94104
(415) 829-4330

September 27, 2018

Helios and Matheson Analytics Inc.
350 Fifth Ave., Ste. 7520
New York, NY 10118

Theodore Farnsworth
Chairman and Chief Executive Officer
Helios and Matheson Analytics Inc.
350 Fifth Ave., Ste. 7520
New York, NY 10118

Stuart Benson
Chief Financial Officer
Helios and Matheson Analytics Inc.
350 Fifth Ave., Ste. 7520
New York, NY 10118

MoviePass Inc.
175 Varick St., 6th Fl.
New York, NY 10014

VIA CERTIFIED/REGISTERED MAIL, RETURN RECEIPT REQUESTED

Re:     Notice under California's CLRA, section 1782

To Whom It May Concern:

This office represents Jackie Tabas, a consumer who is presently a MoviePass subscriber, and Katherine Rosenberg-Wohl, a consumer who signed up for the MoviePass one-year subscription plan at $89.95 on 11/17/17 – a plan she held until she canceled it on 8/3/18. Others, who are similarly situated, may likewise join in our representation.

Helios and Matheson Analytics Inc. ("HMNY") bought a majority stake in MoviePass Inc. ("MP") on 8/15/17. HMNY directed MP to break, and MP broke, MP's monthly contracts with consumers at least as of mid-July, 2018, removing most desirable movies and rendering the contracts worthless, all the while representing that these actions were consistent with MP's contractual commitments and simply designed to enhance them. As of 8/24/18, HMNY directed MP to cancelled, and MP cancelled, the one-year subscription plan and cost consumers the remaining months on that contract, because (1) they truncated service for remainder of the year; and (2) while they may have offered certain consumers a refund for the remainder, (a) they gave only one week to accept, and (b) if a consumer were to opt out, the consumer was precluded from signing up even for the monthly service for 9 months. Also, HMNY directed MP and MP (3) did not provide a refund – whether promptly, easily, or at all -- when asked. Also, HMNY directed MP and MP (4) did not provide access for consumers -- even truncated access -- for the remainder of the year for which consumers had paid. Specifically, Ms. Tabas cannot find available the movies she

EXH. 2
1

September 27, 2018
Page 2

wishes to see, and Ms. Rosenberg-Wohl, while promised that her membership is still active, can no longer use her card and cannot, despite repeated attempts, get either service or a refund from MP. Messers. Farnsworth and Benson are named individually because, due to their respective responsibilities as CEO and CFO, any of the above decisions made by HMNY must have been made upon either their recommendation or their approval.

This conduct is in violation, *inter alia*, of California Civil Code sections: CLRA Section 1770(a)(6) – "[a]dvertising goods or services with intent not to sell them as advertised;" (7) – "[a]dvertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity;" (10) – "[m]aking false or misleading statements concerning reasons for price reductions;" and (12) – "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not."

My clients are entitled to actual damages, an injunction, restitution, punitive damages, attorneys' fees, as well as any relief a court deems proper under CLRA section 1780(a). Because the conduct described above has caused damage to other consumers similarly situated, my clients may bring an action for the relief described on behalf of not just themselves but other consumers under CLRA section 1781(a). Under CLRA section 1782(a)(2), my clients demand that Helios and Matheson Analytics, Inc., on its part, and MoviePass Inc., on its part, correct, replace or otherwise rectify the goods/services described above in a way that makes them whole, makes similarly situated consumers whole, and makes sure that no other consumers are subject to this conduct.

HMNY and MP are liable under other state statutes beyond California's CLRA, as well as federal law. But while other statutes do not provide a 30-day safe harbor of sorts should a proper response be made to this Notice, California's CLRA does, hence this letter.

Very truly yours,

HERSHENSON ROSENBERG-WOHL, a Professional Corporation

By: _____

David M. Rosenberg-Wohl

HERSHENSON
ROSENBERG-WOHL
A PROFESSIONAL CORPORATION
315 Montgomery St., 8ᵗʰ Fl.
San Francisco, CA 94104
(415) 829-4330

September 27, 2018

Helios and Matheson Analytics Inc.
350 Fifth Ave., Ste. 7520
New York, NY 10118

Theodore Farnsworth
Chairman and Chief Executive Officer
Helios and Matheson Analytics Inc.
350 Fifth Ave., Ste. 7520
New York, NY 10118

Stuart Benson
Chief Financial Officer
Helios and Matheson Analytics Inc.
350 Fifth Ave., Ste. 7520
New York, NY 10118

MoviePass Inc.
175 Varick St., 6ᵗʰ Fl.
New York, NY 10014

VIA CERTIFIED/REGISTERED MAIL, RETURN RECEIPT REQUESTED

Re:     Notice under California's CLRA, section 1782

To Whom It May Concern:

This office represents Jackie Tabas, a consumer who is presently a MoviePass subscriber, and Katherine Rosenberg-Wohl, a consumer who signed up for the MoviePass one-year subscription plan at $89.95 on 11/17/17 – a plan she held until she canceled it on 8/3/18. Others, who are similarly situated, may likewise join in our representation.

Helios and Matheson Analytics Inc. ("HMNY") bought a majority stake in MoviePass Inc. ("MP") on 8/15/17. HMNY directed MP to break, and MP broke, MP's monthly contracts with consumers at least as of mid-July, 2018, removing most desirable movies and rendering the contracts worthless, all the while representing that these actions were consistent with MP's contractual commitments and simply designed to enhance them. As of 8/24/18, HMNY directed MP to cancelled, and MP cancelled, the one-year subscription plan and cost consumers the remaining months on that contract, because (1) they truncated service for remainder of the year; and (2) while they may have offered certain consumers a refund for the remainder, (a) they gave only one week to accept, and (b) if a consumer were to opt out, the consumer was precluded from signing up even for the monthly service for 9 months. Also, HMNY directed MP and MP (3) did not provide a refund – whether promptly, easily, or at all -- when asked. Also, HMNY directed MP and MP (4) did not provide access for consumers -- even truncated access -- for the remainder of the year for which consumers had paid. Specifically, Ms. Tabas cannot find available the movies she

EXH. 2

September 27, 2018
Page 2

wishes to see, and Ms. Rosenberg-Wohl, while promised that her membership is still active, can no longer use her card and cannot, despite repeated attempts, get either service or a refund from MP. Messers. Farnsworth and Benson are named individually because, due to their respective responsibilities as CEO and CFO, any of the above decisions made by HMNY must have been made upon either their recommendation or their approval.

This conduct is in violation, *inter alia*, of California Civil Code sections: CLRA Section 1770(a)(6) – "[a]dvertising goods or services with intent not to sell them as advertised;" (7) – "[a]dvertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity;" (10) – "[m]aking false or misleading statements concerning reasons for price reductions;" and (12) – "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not."

My clients are entitled to actual damages, an injunction, restitution, punitive damages, attorneys' fees, as well as any relief a court deems proper under CLRA section 1780(a). Because the conduct described above has caused damage to other consumers similarly situated, my clients may bring an action for the relief described on behalf of not just themselves but other consumers under CLRA section 1781(a). Under CLRA section 1782(a)(2), my clients demand that Helios and Matheson Analytics, Inc., on its part, and MoviePass Inc., on its part, correct, replace or otherwise rectify the goods/services described above in a way that makes them whole, makes similarly situated consumers whole, and makes sure that no other consumers are subject to this conduct.

HMNY and MP are liable under other state statutes beyond California's CLRA, as well as federal law. But while other statutes do not provide a 30-day safe harbor of sorts should a proper response be made to this Notice, California's CLRA does, hence this letter.

Very truly yours,

HERSHENSON ROSENBERG-WOHL, a Professional Corporation

By: _____
David M. Rosenberg-Wohl